

**Peer Review Services**
*MLS Group of Companies, Inc.*
29792 Telegraph Road | Southfield, Michigan 48034
t. 248.945.9001 | f. 248.356.6757 | www.mls-ime.com

# AGREEMENT FOR PEER REVIEW CONSULTING SERVICES

## Tier II

This **AGREEMENT FOR PEER REVIEW CONSULTING SERVICES**, dated as of August 13, 2008, 2008 (this "Agreement"), is made and entered into by and between MLS Group of Companies, Inc. ("Company"), and **Trenton Gause, M.D.** a licensed physician ("*Reviewer*") to provide the services subject to the terms and conditions stated below.

### RECITALS

A. The Company desires to engage Reviewer to perform certain peer review services, as more fully described herein, and Reviewer desires to perform such services as a Reviewer;

B. The Reviewer is ready, willing and able to perform the services under said conditions; and

C. The Reviewer has met the minimum standards as hereafter set forth and described.

NOW, THEREFORE, in consideration of the above recitals and the following terms and conditions, the Company and Reviewer agree as follows:

1. **DESCRIPTION OF SERVICES**

    1.1 Company engages Reviewer as an independent contractor to provide peer review services, which may include, among other things, the review of medical and non-medical data, reports, studies, investigations, examinations, diagnoses and other information as may be relevant to the determination of whether an impairment exists for a subject individual, corresponding medical supported physical restriction/limitations, functional capacity, consultations with attending physicians, and the issuance of a report summarizing the findings of the Reviewer based upon Reviewer's analysis of the medical and non-medical data provided to Reviewer. From time-to-time, Reviewer may also provide reviews of job descriptions in connection with a transferable skills analysis assignment and be asked to address other specific issues requested, such as treatment recommendations, treatment necessity, causation, and disability status.

    1.2 Reviewer's report on any particular assignment shall be dictated by Reviewer via the Company's digital dictation system, which Reviewer will access through the Company's

dedicated telephone line. Once Reviewer dictates the Report, the Company will issue a draft of the report to Reviewer for review and approval. Reviewer acknowledges and affirms that the Company may, in any given assignment, coordinate consultations between Reviewer and attending physicians and that, in such circumstances, the Company may memorialize all contacts between the Company and the attending physician and Reviewer in Reviewer's draft report. When requested by the referring entity, MLS will issue a synopsis letter on Reviewer's behalf, outlining any peer-to-peer consultations described in the body of Reviewer's report in the format set forth on ATTACHMENT C. The synopsis letter and the peer-to-peer consultation section of the draft report will be provided to the attending physician with whom Reviewer consulted for his or her review and comment. Reviewer further acknowledges and affirms that Company may review and edit, as necessary, Reviewer's draft report for quality assurance purposes, which will include the correction of typographical and/or grammatical errors, and may request that Reviewer clarify any statements in his or her report.

1.3 Reviewer authorizes the Company to affix Reviewer's electronic signature (in the form attached as Attachment B) to any final report approved by Reviewer. Reviewer is solely responsible for the accuracy and contents of any report prepared and submitted under this Agreement and any opinions expressed therein.

1.4 Nothing in this agreement generally or in paragraph 1.2 specifically shall be construed as conferring upon the company any authority to alter or influence the substantive contents of Reviewer's report or any opinions or conclusions expressed therein.

1.5 The services provided by Reviewer under this Agreement shall at no time require the actual physical examination of patients or the rendering of medical advice or opinions to any individual. At no time, shall Reviewer's services under this Agreement be deemed to constitute or create a physician/patient relationship or a contractual relationship with any person or entity that is not a named party to this Agreement. This Agreement is not intended for the benefit of any third party.

1.6 Assignments shall be made to Reviewer on an individual basis. Each assignment shall be performed and completed by the due date as indicated in the specific instructions that shall be included with each individual assignment.

1.7 This Agreement in no way obligates Company to utilize Reviewer's services or for Reviewer to accept an Assignment from Company. However, it is understood that if Reviewer does accept an assignment form Company, Reviewer shall be obligated to fully complete the assignment within the time frames set forth by Company.

2. **REVIEWER QUALIFICATIONS**

   2.1 Prior to performing any services, Reviewer shall demonstrate, to Company's satisfaction, that Reviewer meets the following minimum qualifications:

2

- Holds a current and unrestricted license to practice in at least one state;
- Holds current board certification in at least one specialty by a board approved by either (as applicable);
  - The American Board of Medical Specialties (ABMS)
  - Advisory Board of Osteopathic Specialists (ABOS)
  - The American Board of Podiatric Surgery (D.P.M.)
  - The American Dental Association Council on Dental Education and Licensure (D.D.S. or D.M.D.)
  - The American Board of Chiropractic Specialties (D.C.)
- Has recent experience or familiarity with current body of knowledge and medical practice;
- Has a minimum of five (5) years of experience providing health care;
- Is experienced in a clinical specialty consistent with the type of review to be conducted;
- Is engaged in active clinical practice for a minimum of 20 hours per week;
- Is without any current sanctions and/or disciplinary actions, as imposed by any governing federal or state entity (e.g. OIG, GSA, etc.);
- Maintains professional liability insurance coverage (or self insurance as identified in this Agreement) that meets the Reviewer's primary state of licensure's minimum requirements.

## 3. INDEPENDENT CONTRACTOR

3.1 During the performance of Reviewer's services under this Agreement, Reviewer shall at all times be acting and performing as an independent contractor. It is expressly agreed by Company and Reviewer that nothing contained herein shall be construed as creating the relationship of agency, employer-employee, co-partners or joint ventures as between Company and Reviewer.

3.2 Reviewer's taxpayer identification number is 

## 4. FEES

4.1 The total fee paid to Reviewer shall vary depending on the assignment, and shall be clearly conveyed to Reviewer herein. . Reviewer shall accept the agreed upon fee at the time of performing any review services in accordance with the following pricing structure:


*Independent Peer Review*



3

### *Independent Peer-to-Peer Review*
Peer Review services 
Attending Physician Contact

### *Multidisciplinary Panel Review*
Peer Review services 
Multidisciplinary teleconference

### *Additional Documentation*
Review of CD/video Surveillance 
Addendum Requests

    4.2  The parties acknowledge that the agreed upon fee is a lump-sum fee, and shall include all typing, postage, copying and telephone costs, which may be incurred by Reviewer during the course of performing the review.

5. **HIPAA COMPLIANCE / CONFIDENTIALITY OF PROTECTED INFORMATION**

    5.1 Reviewer shall comply with the standards set forth in the "Second Tier Business Associate Agreement", attached as "ATTACHMENT A", as that agreement relates to t he Health Insurance Portability and Accountability Act of 1996 (HIPAA), 45 C.F.R. Parts 160, 162, and 164, and shall use all appropriate safeguards to prevent the unauthorized use or disclosure of protected health information (PHI) including, but not limited to, the receipt and transmission of PHI via paper, electronic, media, facsimile, voice and/or telephone.

    5.2 Reviewer shall comply with all other applicable federal and state laws regarding the confidentiality and/or disclosure of mental health records, HIV, and substance abuse records, or any other individually identifiable health information, including, but not limited to, the State of Michigan.

6. **PROPRIETARY INFORMATION**

    6.1 Reviewer shall keep all proprietary and/or confidential information regarding Company's operations (e.g., client lists, pricing policies, advertising and public relations strategies, software and hardware programs, supplier lists, marketing strategies and procedures, training materials and procedures, etc.) in strict confidence, and shall utilize that information solely as is necessary for Reviewer to fulfill its obligations as set forth in this Agreement. Reviewer shall not disclose Company's proprietary information to anyone without the express written permission of Company.

CONFIDENTIAL    DSUPP 000021

## 7. CONFLICT OF INTEREST

7.1 Reviewer shall not perform any assignment for Company for which Reviewer has a material professional, familial, or financial conflict of interest. Reviewer understands and acknowledges that a conflict of interest may include, but is not limited to, the following:
- An ownership interest in any of the parties;
- A material professional or business relationship with any of the parties;
- A direct or indirect financial incentive or compensation for a particular determination;
- The existence of incentives that promote the use of a certain product or service;
- A known familial relationship with any of the parties; and/or
- Any prior involvement in the specific case under review.

7.2 As used in this document, a "party" shall include the following:
- The client or referring entity;
- The disability benefits plan or workers' compensation benefits plan under review;;
- The claimant or the claimant's representative;
- The consumer's attending provider or any other health care provider currently or previously involved in the case;
- The facility at which the recommended treatment would be, or has been provided;
- The developer or manufacturer of the principal drug, device, procedure or other therapy being recommended for the consumer;
- Any officer, director or management employee of the client, referring entity, disability benefits plan or workers' compensation plan under review.

## 8. INSURANCE

8.1 Reviewer shall maintain professional liability insurance coverage in an amount consistent with the minimum requirements as set forth by the licensing body in Reviewer's primary state of licensure. In those states that do not require professional liability insurance (e.g., Florida), Reviewer shall demonstrate financial responsibility by compliance with the state's applicable statutes or regulations (e.g. Reviewer shall maintain a state-approved escrow account, an irrevocable letter of credit, etc.).

8.2 Company may, in its sole discretion, provide "Managed Care Errors and Omissions Liability" insurance coverage to Reviewer at a nominal fee on an individual assignment basis.

5

## 9. INDEMNIFICATION

9.1 Company shall indemnify, hold harmless and defend Reviewer and any of its employees or agents from and against any liability in any form (including, but not limited to, reasonable counsel fees and costs) arising from or out of the direct and sole consequence of Company's or its officer's, employee', subcontractor' and/or agents' gross negligence, intentional wrongdoing, bad faith, criminal conduct and/or fraud while in the performance of Company's obligations under this Agreement.

9.2 Reviewer shall indemnify, hold harmless and defend Company and any of its officers, employees, subcontractors and/or agents from and against any liability in any form (including, but not limited to, reasonable counsel fees and costs) arising from or out of the direct and sole consequence of Reviewer's or its employees' or agents' gross negligence, intentional wrongdoing, bad faith, criminal conduct and/or fraud while in the performance of Reviewer's obligations under this Agreement.

9.3 Each party agrees to immediately notify the other in writing of any such claim or potential claim for which indemnification may be sought, so that neither party is materially prejudiced in its ability to participate in any proceedings.

## 10. ASSISTANCE IN LITIGATION

10.1 In the event of any third party litigation or threatened litigation brought against Company, but not Reviewer, relating to the services provided for in this Agreement, upon the written request of Company, Reviewer agrees to provide to Company a copy of Reviewer's records relating to the individual who is the subject of such action.

10.2 Pursuant to a subpoena or discovery request served upon Reviewer by a third party, Reviewer shall notify Company of such subpoena or discovery request and cooperate with Company in any efforts to produce or quash such subpoena or discovery request. Additionally, Reviewer shall make available the requested documents and/or Reviewer's employee or agent to assist Company in its defense of such claim or to testify in connection with the proceeding or action.

10.3 The parties agree that whenever Company is a named party to an action, but Reviewer is not a named party, the parties shall work together cooperatively and consider their common interests aligned in defense of such action. Company shall, consistent with its travel expense guidelines, reimburse Reviewer for its reasonable out-of-pocket and travel costs or expenses related to Reviewer assistance but excluding any counsel fees, within a reasonable time from Company's receipt of an invoice for such reimbursement. The parties agree that, should it appear that their interests in defending such an action are not aligned, each party shall give the other prompt notice thereof.

CONFIDENTIAL                                                                                                        DSUPP 000023

## 11. DISPUTE RESOLUTION

11.1 The parties shall meet and confer in good faith to resolve any problems or disputes that may arise under this Agreement.

11.2 Any dispute or controversy between the parties, including a fee dispute or a dispute arising from an alleged material breach of this Agreement, shall, on written request of one party served on the other, be submitted to arbitration by means best suited to the timely resolution of the dispute including, but not limited to, on premises, teleconference, or video conference. Any arbitration shall be conducted by a single arbitrator, in accordance with the Michigan Court Rules. Judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction thereof. The parties intend that this agreement to arbitrate be valid, enforceable and irrevocable. The decision of the arbitrator shall be final and conclusive upon all parties. The arbitration shall be conducted in Oakland County, Michigan, unless otherwise mutually agreed to by the parties.

## 12. MISCELLANEOUS

12.1 <u>Addenda</u>. All addenda referenced in this Agreement are incorporated herein as though set forth in full. If any provision of this Agreement conflicts with any addendum to this Agreement, this Agreement shall control with respect to the subject matter of such addendum.

12.2 <u>Amendment</u>. Company may amend any provision of this Agreement upon thirty (30) calendar days prior written notice to Reviewer.

12.3 <u>Assignment</u>. This Agreement is not assignable by Reviewer, and any attempted assignment shall be considered null and void.

12.4 <u>Entire Agreement</u>. This Agreement, together with any addenda or appendices referenced herein and attached hereto, shall constitute the full and complete expression of the rights and obligations of the parties with respect to the services to be rendered and payments to be made, and cannot be modified in any respect without the establishment of written amendments or additional written addenda or appendices signed and executed by both parties. This Agreement supersedes any and all other agreements, written or oral, made by the parties.

12.5 <u>Governing Law.</u> This Agreement shall be governed by the laws of the State of Michigan.

12.6 <u>Notices.</u> All notices, demands, or other communications (excluding payments) required or permitted hereunder shall be effected by delivery in writing by either 1) registered or certified USPS mail, return receipt requested, or 2) reputable overnight carrier (e.g.,

CONFIDENTIAL                                                                DSUPP 000024

FedEx, DHL, etc..), delivery prepaid. Notices sent via overnight carrier shall be deemed communicated as of the date of delivery to the party by the carrier; notices sent via USPS mail shall be deemed communicated as of the date indicated on the return receipt.

12.7 <u>Severability.</u> In the event that any provision of this Agreement is held by a court of competent jurisdiction to be invalid, unlawful, or otherwise unenforceable, the remaining provisions of this Agreement shall remain in full force and effect.

12.8 <u>Third Party Rights</u>. This Agreement is not intended and shall not be construed to create any rights for any third party.

14. **TERMINATION OF AGREEMENT**

Either party may terminate this Agreement at any time, with or without cause, upon delivery to the other of thirty (30) calendar days written notice. Termination of this Agreement shall not relieve the parties of any obligations that arose prior to the effective date of the termination. Upon the termination of this Agreement, for any reason, and at Company's request, Reviewer agrees to complete any Assignments being performed hereunder that are in progress at the time of the termination.

The parties execute this Agreement to be effective as of the date first above written.

| MLS Group of Companies, Inc.<br>29792 Telegraph Road<br>Southfield, MI 48034 | Trenton Gause, M.D. |
|---|---|
| Signature: _[signature]_ | Signature: _[signature]_ |
| Date: 8/12/08 | Date: 8-21-08 |

8

**CONFIDENTIAL**

## ATTACHMENT A

## SECOND TIER BUSINESS ASSOCIATE ADDENDUM
Health Insurance Portability and Accountability Act (HIPAA) Compliance

**WHEREAS**, Subcontractor is a Covered Entity or a Business Associate of a Covered Entity for purposes of the Federal privacy and security regulations developed by the U.S. Department of Health and Human Services at 45 C.F.R. Parts 160 and 164 (Security Standards for the Protection of Electronic Health Information or "Security Rule" and the Standards for Privacy of Individually Identifiable Health Information or "Privacy Rule") promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, 42 U.S.C. §§ 1320d-1320d-8;

**WHEREAS**, Subcontractor may receive PHI (as defined below) from Business Associate, or may create or obtain PHI from other parties for use on behalf of Business Associate, which PHI can be used or disclosed only in accordance with this Agreement and the standards established by HIPAA and the Privacy Rule, and

**WHEREAS**, Subcontractor may receive PHI from Business Associate, or may create or obtain PHI from other parties for use on behalf of Business Associate, which is in electronic form, which PHI must be handled in accordance with the terms of this Agreement and the standards established by HIPAA and the Privacy Rule, and

**WHEREAS**, this Agreement supplements, addends and is made part of the "Agreement for Medical Consulting Services" entered into between Business Associate and Subcontractor;

**NOW THEREFORE**, Business Associate and Subcontractor agree as follows:

I.  **DEFINITIONS**

A.  Definitions. Unless otherwise specified in the Application or in this Addendum, all capitalized terms used here shall have the same meaning as set forth in 45 C.F.R. Parts 160 and 164.

B.  PHI. PHI means Protected Health Information, which is individually identifiable health information that is transmitted by, or maintained in, electronic media or any other form or medium. This information must relate to 1) the past, present, or future physical or mental health, or condition of an individual; 2) provision of health care to an individual; or 3) payment for the provision of health care to an individual. If the information identifies or provides a reasonable basis to believe it can be used to identify an individual, it is considered individually identifiable health information. (Part II, 45 CFR 164.501.)

C.  Business Associate. This term is as defined at 45 CFR ¶ 160.103, means, with respect to a covered entity, a person who (1) on behalf of the covered entity or of an organized health care arrangement in which the covered entity participates, but other than in the capacity of a member of the workforce of such covered entity or arrangement, performs,

or assists in the performance of a function or activity involving the use or disclosure of individually identifiable health information, including claims processing or administration, data analysis, processing or administration, utilization review, quality assurance, billing, benefit management, practice management, and re-pricing; or any other function or activity regulated by 45 CFR Parts 160, 162, or 164; or (2) provides, other than in the capacity of a member of the workforce of such covered entity, legal, actuarial, accounting, consulting, data aggregation, management, administrative, accreditation, or financial services to or for such covered entity, or to or for an organized health care arrangement in which the covered entity participates, where the provision of the service involves the disclosure of individually identifiable health information from such covered entity or arrangement, to the person. A covered entity may be a business associate of another covered entity.

D. <u>Covered Entity</u>. As defined at 45 CFR ¶ 160.103, means a health plan, a health plan, a health care clearinghouse, or a health care provider who transmits any health information in electronic form in connection with a transaction covered by 45 CFR Parts 160, 162 or 164.

E. <u>Subcontractor.</u> Means, with respect to a business associate, a person who on behalf of the business associate, performs or provides (other than in the capacity of a member of the workforce of such business associate) consulting services to or for such business associate, where the provision of the service involves the disclosure of individually identifiable health information from such business associate, to the person.

## II. STATED PURPOSES FOR WHICH SUBCONTRACTOR MAY USE OR DISCLOSE PHI

Business Associate and Subcontractor hereby agree that Subcontractor shall be permitted to use and/or disclose PHI provided by, or obtained on behalf of, Business Associate for the purpose of performing medical case reviews as defined in the "Agreement for Medical Consulting Services".

## III. ADDITIONAL PURPOSES FOR WHICH SUBCONTRACTOR MAY USE OR DISCLOSE INFORMATION

A. **Use and/or Disclosure of Information for Management, Administration, and Legal Responsibilities.** Subcontractor is permitted to use PHI provided by, or created or received by Subcontractor from or on behalf of Business Associate if necessary for the proper management and administration of Subcontractor or to carry out legal responsibilities of Subcontractor, except as otherwise limited in this Agreement.

B. **Data Aggregation Services.** Subcontractor may also be permitted to use or disclose PHI to provide data aggregation services, as that term is defined by 45 CFR ¶ 164.501, if specific authorization is first received from Business Associate.

2

## IV. SUBCONTRACTOR OBLIGATIONS

A. **Limits on Use and Further Disclosure Established by this Agreement and Law.** Subcontractor agrees that the PHI provided by, or created or received by Subcontractor from or on behalf of, Business Associate, shall not be further used, disclosed or compiled other than as permitted or required by this Agreement or as required by law.

B. **Appropriate Safeguards.** Subcontractor shall employ and maintain appropriate safeguards to 1) protect the confidentiality, integrity and availability of PHI and 2) prevent any unauthorized use or disclosure of PHI that it creates, receives, maintains or transmit on behalf of Business Associate.

C. **Reports of Improper Use, Disclosure or Exposure of PHI.** Subcontractor shall notify Business Associate if it becomes aware of a situation in which the confidentiality of any PHI has, or may have, been breached. Subcontractor shall report such breach to Business Associate within two (2) business days of Subcontractor's discovery or knowledge of the unauthorized use, disclosure or exposure. Subcontractor's report shall, at a minimum identify:

   1. the nature of the use or disclosure;
   2. the specific PHI used or disclosed
   3. the identity of the individual or entity that received the PHI;
   4. the action(s) taken by Subcontractor to mitigate any deleterious effect(s) of the use or disclosure;
   5. the corrective action(s) taken or planned to prevent further breaches; and
   6. any other information reasonably requested by Business Associate.

D. **Employees and Agents.** Subcontractor shall ensure that employees and agents who, during the course of Subcontractor's duties, may come into contact with PHI provided by, or created or received by Subcontractor from or on behalf of, Business Associate agree to the same restrictions and conditions contained herein that apply to Subcontractor.

E. **Right of Access to PHI.** Subcontractor shall notify Business Associate within five (5) business days of any individual requests for access to PHI. Within ten (10) business days of receiving written approval of release of such information from Business Associate, Subcontractor shall make available and provide access to the PHI of an individual who is the subject of that PHI. Subcontractor shall provide PHI in the format requested, unless it cannot readily be produced in such format, in which case it shall be provided in standard hard copy. This right of access shall conform with and meet all of the requirements for such access as set forth at 45 CFR ¶ 164.524.

F. **Amendment of PHI.** Subcontractor shall make PHI available for amendment and/or shall incorporate the amendment, such that a Covered Entity is able to comply with the requirements set forth at 45 CFR ¶164.526. If any individual requests an amendment from

3

Subcontractor or its employees or agents, Subcontractor shall notify Business Associate of same within five (5) business days.

G. **Provide Accounting of Disclosures.** Subcontractor shall maintain a record of all disclosures of PHI made to persons or entities other than Subcontractor's employees or agents. Such records shall include, for each disclosure, the date of the disclosure, the name and address of the recipient of the PHI, a description of the PHI disclosed, the name of the individual who is the subject of the PHI disclosed, and the purpose of the disclosure. Subcontractor shall maintain the disclosure records for a period of seven (7) years after termination of this Agreement, unless Business Associate and Subcontractor agree otherwise. Subcontractor shall make such record available to the individual or Business Associate within thirty (30) calendar days of a request for an accounting of disclosures.

H. **Access to Books and Records.** Subcontractor shall make its internal practices, books, and records relating to the use or disclosure of PHI provided by, or created or received by Subcontractor from or on behalf of, Business Associate, available to the Secretary of the United States Department of Health and Human Services (or his designee) for purposes of determining compliance with HIPAA regulations.

I. **Return or Destruction of PHI.** At termination of this Agreement, Subcontractor shall return or destroy all PHI provided by, or created or received by Subcontractor from or on behalf of, Business Associate. Subcontractor shall not retain any copies of the PHI after termination of this Agreement. If return or destruction of the PHI is not feasible, Subcontractor shall extend the protections of this Agreement to limit any further use or disclosure until such time as the PHI may be returned or destroyed. If Subcontractor elects to destroy the PHI, Subcontractor shall certify to Business Associate, in writing, that the PHI has been destroyed.

J. **Mitigation Procedures.** Subcontractor shall establish and provide to Business Associate upon request, procedures for mitigating, to the maximum extent practicable, any harmful effect from the use or disclosure of PHI in a manner contrary to this Agreement or the Privacy or Security Rules.

K. **Sanction Procedures.** Subcontractor shall develop and implement a system of sanctions for any employee or agent who violates this Agreement or the Privacy or Security Rules.

L. **Grounds for Breach.** Any noncompliance by Subcontractor with this Agreement or the Privacy or Security Rules shall automatically be considered to be a breach of the Agreement, if Subcontractor knew or reasonably should have known of such noncompliance and failed to immediately take reasonable steps to cure the noncompliance.

M. **Failure to Perform Obligations.**
Business Associate may immediately discontinue providing PHI to Subcontractor in the

4

event Subcontractor fails to perform its obligations under this Agreement. Business Associate may also, at its discretion, require Subcontractor to submit to a plan of compliance, including monitoring by Business Associate and reporting by Subcontractor, as Business Associate in its sole discretion determines to be necessary to maintain compliance with this Agreement and applicable law.

## V. BUSINESS ASSOCIATE OBLIGATIONS:

A. **Permissions.** Business Associate shall provide Subcontractor with any changes in, or revocation of, permission by an individual to use or disclose PHI of which Business Associate is aware, if such changes affect Subcontractor's permitted or required uses and disclosures.

B. **Restrictions.** Business Associates shall notify Subcontractor of any restriction to the use or disclosure of PHI that Business Associate has agreed to in accordance with a Covered Entity's obligation as set forth at 45 CFR ¶164.522, to the extent that such restriction may affect Subcontractor's use or disclosure of PHI.

## VI. MISCELLANEOUS TERMS:

A. **Injunctive Relief.** Business Associate retains all rights to seek injunctive relief to prevent or stop the unauthorized use or disclosure of PHI provided by, or obtained on behalf of, Business Associate by Subcontractor or its employees or agents

B. **Indemnification.** Business Associate shall indemnify, hold harmless and defend Subcontractor and any of its employees or agents from and against any liability in any form (including, but not limited to, reasonable counsel fees and costs) arising from or out of the direct and sole consequence of Business Associate's or its officers', employees', other subcontractors' and/or agents' unauthorized use or disclosure of PHI.

Subcontractor shall indemnify, hold harmless and defend Business Associate and any of its employees or agents from and against any liability in any form (including, but not limited to, reasonable counsel fees and costs) arising from or out of the direct and sole consequence of Subcontractor's or its officers', employees', other subcontractors' and/or agents' unauthorized use or disclosure of PHI.

Each party agrees to immediately notify the other in writing of any such claim or potential claim for which indemnification may be sought, so that neither party is materially prejudiced in its ability to participate in any proceedings.

C. **Subpoenas.** Subcontractor shall provide notice to Business Associate of any subpoena, or other legal process, seeking PHI provided by, or obtained on behalf of, Business Associate, or otherwise relating to Subcontractor's duties under this Agreement. Subcontractor shall provide such notice to Business Associate within 48 hours of receipt of such subpoena or other legal process.

5

CONFIDENTIAL

D.  **Term.** The effective date of this Agreement shall be the same as the effective date of the "Agreement for Medical Consulting Services" to which this Agreement is appended, and shall terminate when all of the PHI provided by, or created or received by Subcontractor from or on behalf of, Business Associate is destroyed or returned to Business Associate e in accordance with the terms set forth in paragraph 4(I), above.

E.  **Amendment of Agreement.** The parties agree to take such action as is necessary to amend this Agreement from time to time as is necessary to comply with any amendments made to HIPAA and/or its implementing regulations, currently set forth at 45 CFR Parts 160, 162, and 164.

Business Associate

MLS Group of Companies, Inc.
29792 Telegraph Road
Southfield, MI 48034

Signature: _____

Date: 8/12/08

Subcontractor

Trenton Gause, M.D.

Signature: _____

Date: 8-21-08

6

**CONFIDENTIAL**

## ATTACHMENT B

### REVIEWER'S ELECTRONIC SIGNATURE

Reviewer authorizes the Company to utilize the electronic signature set forth below in accordance with the terms and conditions of this Agreement.



```
Please sign within the box as this will be kept on file as your electronic signature
            and will be affixed to your report once finalized.
```

## ATTACHMENT C

DATE

REGARDING:

Independent Peer Review on behalf of MLS Peer Review Services.

Dear Dr. ,

As discussed in our peer-to-peer consultation regarding_____, on behalf of your patient's disability carrier, I was requested to contact you to obtain additional information in regard to this claimant's medical and functional status. For the sake of accuracy and to ensure correct interpretation and meaning of our discussion, I have enclosed the portion of the report that outlines our discussion and ask that you please review it.

If any of the above conversation was misinterpreted or if anything was taken out of context, please make the necessary changes or comments directly to the document, and fax back to 248-356-6757. If the above synopsis is an accurate reflection of our discussion, please sign and fax back to 248-356-6757.

Respectfully submitted,

_____
Reviewing Physician

_____
Attending Physician

2

# PEER REVIEWER ATTESTATION

I, _____, understand that as a peer reviewer for MLS Group of Companies, Inc. (MLS), I cannot review any case for which I have a material, professional, familial, or financial conflict of interest. I understand that a conflict of interest can include, but is not limited to the following:

- ☐ An ownership interest of greater than 5% with any of the parties;
- ☐ A material professional or business relationship with any of the parties;
- ☐ A direct or indirect financial incentive or compensation for a particular determination;
- ☐ The existence of incentives that promote the use of a certain product or service;
- ☐ A known familial relationship with any of the parties;
- ☐ Any prior involvement in the specific case under review.

As used in this document, a "party" shall include the following:

- ☐ The claimant or the claimant's representative;
- ☐ The client or referring entity;
- ☐ Any officer, director or management of employee of the client or referring entity;
- ☐ The insurance carrier, health benefits *or* managed care plan under review;
- ☐ Any officer, director or management of employee of the insurance carrier, health benefits or managed care plan under review;
- ☐ The claimant's health care provider, the physician, the physician's medical group or the independent practice association currently or previously involved in the case;
- ☐ The facility at which any recommended treatment would be, or has been, provided;
- ☐ The developer or manufacturer of the principal drug, device, procedure, and/or other therapy being recommended for the enrollee.

I further declare that I:

- ☐ do not have a conflict of interest for this assigned review
- ☐ am not being compensated for any review that is dependent in any way on the specific outcome of my review
- ☐ have had no involvement with this case prior to being assigned to this review

I, therefore, attest by my signature below that if I identify a conflict of interest on any case submitted to me by MLS, I will immediately:

- ☐ Rescue myself from the case and notify MLS of my recusal; and
- ☐ Return any and all case files, information, and/or documents to MLS.

Signature of Reviewer: _____

Print Name: TRENTON McCAUSE        Date: 8-21-05

3